**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **NILDA RODRÍGUEZ-LÓPEZ**, Plaintiff, <br><br> v. <br><br> **TRIPLE-S VIDA, INC.,** Defendant. | Civil No. 14–1498 (BJM) |

## OPINION AND ORDER

Before the court are cross motions for summary judgment filed by plaintiff Nilda Rodríguez-López ("Rodríguez") and defendant Triple-S Vida, Inc. ("Triple-S") as to Rodríguez's claim under § 502 of the Employee Retirement Income Security Act ("ERISA"[1]), 29 U.S.C. § 1132. Docket No. 46, "Def. Mot."; Docket No. 48, "Pl. Mot." The parties filed respective motions in opposition and replies. Docket Nos. 58, 60, 62, 65. Following an appeal to and remand from the United States Court of Appeals for the First Circuit, both parties filed supplemental motions for summary judgment. Docket Nos. 84, 85. For the reasons that follow, defendant's motion is **denied**, and plaintiff's motion is **granted**.

## STANDARD OF REVIEW

ERISA promotes the interests of employees and their beneficiaries in employee benefit plans, and protects contractually defined benefits. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 113 (1989). Under ERISA, a participant or beneficiary may bring a civil action to recover benefits due to her or enforce her rights under the terms of the benefits plan. 29 U.S.C. § 1132(a)(1)(B). The default standard for reviewing benefits decisions is de novo, and only is displaced if the benefit plan grants discretionary authority to an administrator or fiduciary to determine benefits eligibility. *Gross v. Sun Life Assur. Co. of Can.*, 734 F.3d 1, 11 (1st Cir. 2013). "If the plan affords such discretion, the court applies a deferential arbitrary and capricious or abuse

---

[1] 29 U.S.C. §1001 *et seq.*

of discretion standard." *Id.*, at 11 (*quoting Maher v. Mass. Gen. Hosp. Long Term Disability Plan*, 665 F.3d 289, 291) (internal quotations omitted).

Here, this case is on remand from the First Circuit after it determined that this court should have applied a de novo standard as opposed to an arbitrary and capricious standard of review. *Rodriguez-Lopez v. Triple-S Vida, Inc.*, 850 F.3d 14, 23 (1st Cir. 2017) ("We hold that the Plan does not confer discretionary authority upon Triple-S. Thus, <u>de novo</u> review applies. Because the district court looked at Triple-S's denial of benefits through the wrong standard-of-review lens, we must vacate its judgment and remand for reconsideration."). Therefore, my review of Triple-S's denial of long-term disability ("LTD") benefits to Rodríguez is de novo.

## BACKGROUND

The factual record is summarized here under Local Rule 56.[2] Rodríguez and Triple-S each filed a statement of uncontested facts, and respective oppositions. Docket No. 47, "Def. St."; Docket No. 49, "Pl. St."; Docket No. 59, "Def. Opp."; Docket No. 61, "Pl. Opp."; Docket No. 63, "Def. Reply to Opp." A stipulated copy of the administrative file was also provided, and both parties make reference to it in their respective motions for summary judgment and statements of uncontested facts. Docket Nos. 47–1 to 47–28 and 52–1, Appendix "App." and "App. Supp."; *see* Docket Nos. 43, 50.

For purposes of these motions for summary judgment, the court takes the following facts as true:[3]

***Group Long Term Disability Insurance Plan***

---

[2] Local Rule 56 requires parties at summary judgment to supply and rebut brief numbered statements of fact, pinpoint-citing admissible record evidence. It "relieve[s] the district court of any responsibility to ferret through the record" in search of genuine factual disputes, *CMI Capital Market Inv. v. González-Toro*, 520 F.3d 58, 62 (1st Cir. 2008), and prevents parties from making the court do their homework for them. *Mariani-Colón v. Dep't of Homeland Sec.*, 511 F.3d 216, 219 (1st Cir. 2007). Failing to properly oppose a statement of fact allows the court to deem it uncontested. *Id.*

[3] This background portion does not include facts regarding Rodríguez's mental health, which, as discussed further on, is not relevant to this assessment.

Rodríguez was a participant in a Group Long Term Disability Insurance Policy (the "plan") through her employer and policyholder, Mova. Jefferson-Pilot issued to Mova Group Policy number 45,409, effective January 1, 1990. "The Group Policy is a contract between the Policyholder and Jefferson-Pilot." App. 2–4. Mova, the policyholder, was named as the plan sponsor and administrator. App. 15. The plan's administrator had complete discretionary authority to construe the terms to make benefits determinations, review claims, determine and notify eligibility for benefits, review decisions on administrative appeal, pay benefits, and be served with summons in case a judicial claim is filed. Def. St. ¶¶ 1–5; Def. Opp. ¶ ¶ 44–47; App. 1–24. Jefferson-Pilot would pay the benefits for total or partial disability. App. 11–13. On January 1, 1999, Triple-S notified Mova that it would pay the benefits provided under that group policy number, subject to all the policy's provisions. Def. St. ¶¶ 4–5; Pl. Opp. ¶ 4; App. 1.

The plan offered LTD benefits due to total disability. To qualify for these benefits, the beneficiary had to comply with the definition of "total disability" or "totally disabled" and be under a doctor's care during the entire time of the total disability. "'Total disability' . . . means . . . that you are unable to perform all of the material and substantial duties of your occupation on a full-time basis because of disability: (1) caused by injury or sickness; and (2) that started while you are insured." Pl. St. ¶ 3; Def. St. ¶ 6; App 10. A beneficiary is totally disabled if she is "unable to perform with reasonable continuity all of the material and substantial duties of [her] own or any other occupation for which [she is] or become[s] reasonably fitted by training, education, experience, age and physical and mental capacity." App 10. Benefits would be paid when the beneficiary was totally disabled for longer than the applicable Elimination Period[4] until whichever happened first: (1) the day the total disability ended, (2) death, or (3) the end of the maximum payment period. Def. St. ¶ 7. However, for disabilities due to mental illness, the plan limited payment of benefits to twenty-four months. Def. St. ¶ 12; Pl. Opp. ¶ 12; App. 206–07, 268–69.

---

[4] The "Elimination Period" is 180 continuous days of total disability, beginning on the first day of disability. The plan did not pay benefits during that period. Pl. St. ¶ 3; Def. St. ¶¶ 6–9; App. 10, 20, 22.

*Rodríguez's Disability and Initial Denial of LTD benefits*

Rodríguez, a licensed chemist, worked as a senior chemist/quality control laboratory supervisor for Mova from 1995 to 2004. App. 56, 64–65, 71. Her job required her to stand 30% of the time in an average 8-hour work day, sit 30% of the time, walk 30% of the time, lift 5% of the time, and carry 5% of the time, and to have at least a low degree of dexterity. She had to bend continuously and reach occasionally, but she rarely had to lift, squat, climb, kneel, or perform repetitive tasks. She was required to lift about one pound on an infrequent basis. The use of her feet to operate foot controls was not required. The job could be performed by alternating sitting and standing. She had to frequently read and write, and signing her name was considered a repetitive task. App. 60, 83, 85.

Rodríguez was diagnosed with fibromyalgia, peripheral neuropathy, radiculopathy, hypothyroidism, Hashimoto's thyroiditis, osteoarthritis, rheumatoid arthritis, chronic cervical strain, chronic lumbosacral strain, and severe recurrent major depression with psychosis. Her symptoms included recurrent multiple joint and muscular pains that were at times severe, visual hallucinations, recurrent suicidal thoughts, and some self-inflicted aggressions. She was prescribed medications to mitigate the pain. Pl. St. ¶¶ 27–31; Def. St. ¶ 16; App. 170, 174–76, 241, 244, 503, 507, 512, 515, 519–20, 532–36.

Rodríguez's first symptoms appeared on March 12, 2004, which was also her last day of work. These included pain in her lower back, cervical area, neck, ankle, arms, face, and feet, and inflammation in her right ankle, along with anxiety and depression. Def. St. ¶ 10; App. 27–33, 43–46, 51–56, 64–65, 68, 71; App. Supp. 29.

A lower extremity nerve conduction study, dated March 24, 2004, showed right peroneal motor neuropathy, right peroneal sensory neuropathy, and bilateral tibial motor neuropathy. An electromyography study conducted that same day showed normal results. App. 515, App. Supp. 241. A lumbar area MRI performed on April 5, 2004, revealed degenerative L5 vertebra changes in the vertebral disc and disc height loss. App. 512.

She began treatment with Dr. Héctor J. Cases ("Dr. Cases"), neurologist, on June 21, 2004. A nerve conduction study of her hands, performed on August 17, showed no evidence of median neuropathy or cervical radiculopathy, and although there was some evidence of decreased mobility, the severity was unclear. App. 162–63, App. Supp. 166. Dr. Cases filled out a Triple-S "Functional Capacity Estimate" form on November 29. He understood that her conditions were a result of her employment, and assessed that she could sit and stand for two hours during an 8-hour work day, walk for one hour, and alternate between walking, standing, and sitting for one hour, all with rest periods, for a total of six hours of work. She could occasionally lift and carry up to ten pounds. She could occasionally climb stairs and reach over her shoulders, but never bend at the waist, squat, or crawl. She could perform a simple grip and fine manipulation with either hand, but not pull or push. She could perform repetitive movements with both feet. He found that she faced no restrictions in activities that involved abrupt changes in temperature and humidity or exposure to dust, smoke, and gases. She had moderate restrictions in activities that involved unprotected heights and driving automobile equipment, and total restriction in being near machines in movement. Dr. Cases opined that Rodríguez could not work, full-time or part-time, even if her employer accommodated her limitations and restrictions. Pl. St. ¶ 19; App. 70, 87–88.

Triple-S received Rodríguez's application for LTD benefits on January 13, 2005.[5] She claimed feeling numbness, "an intrusive pain" (App. 52) throughout her entire body, and was unable to walk, lie down, sit, or stand for very long. She stated that she did not anticipate working in the near future, either in her previous occupation or in any other occupation and was not interested in getting training or in working in another type of occupation or work activity. App. 27–33, 43–46, 51–56, 64–65, 68, 71.

Triple-S denied Rodríguez's claim on April 14, 2005. The notice stated that she did not meet the definition of total disability under the plan. Specifically, it advised that Dr. Cases's file was short in content and essentially illegible, and that her test results for a lower nerve conduction

---

[5] The claim form appears signed and dated on December 9, 2004.

velocity test, an electromyography, and a lumbar area MRI were considered, but that these results alone did not show her level of physical functionality, or the severity of her conditions, or how these affected her daily life and activities, and, most importantly, her ability to perform her occupation. App. 158–64.

*Rodríguez's Request for Review and Triple-S's Approval of LTD Benefits on Administrative Appeal*

Rodríguez requested review of the initial denial on June 30, 2005, and added that she was being treated by Dr. Rodolfo Concepción ("Dr. Concepción"), a rheumatologist. She provided new evidence, a neurological evaluation by Dr. Cases, dated May 25, a letter from Dr. Concepción, dated June 22, and whole body bone scan results obtained upon referral by Dr. Concepción. App. 167, 193.

Dr. Cases's neurological evaluation stated that Rodríguez had moderate cervical and paravertebral lumbosacral muscle spasms, but no tenderness or deformities were present in her neck or back. She portrayed a decreased range of motion in her neck. She was able to sit, stand, and walk, but had difficulty lying down and getting up from the exam table. Bending, straining, prolonged sitting, standing, and walking worsened her pain, and she required frequent positional changes. As to her motor functions, she showed no atrophy or fasciculation, had good tone and strength, and tested 5/5 bilaterally in a muscles test he conducted. She showed decreased sensation in both feet, but had good dexterity and normal range of motion in her extremities. No pathological reflexes, tenderness, deformities, atrophy or fasciculation were present. He considered her disabled and unable to work, and recommended that she avoid all types of moderate or strenuous activities. Pl. St. ¶ 19; App. 168–70, App. Supp. 166.

Dr. Concepción stated on June 22 that Rodríguez complained of severe generalized pain and limited joint movement. App. 174–75. The whole body bone scan, with flow and emphasis on the joints, revealed a likelihood of degenerative joint disease, calcification in the costochondral junctions bilaterally, and periodontal disease. Pl. St. ¶ 17; App. 176, App. Supp. 166.

On October 10, 2005, Triple-S awarded Rodríguez on administrative appeal LTD benefits due to disability caused by her mental illness, effective September 24, 2004, limited to a term of 24 months as per the plan. She was not awarded LTD benefits for her physical ailments, but was notified that her physical condition would be further investigated. Def. St. ¶¶ 11–12; App. 206–08. Benefits for mental illness would expire September 24, 2006.[6] App. 405.

### Triple-S's Review of Rodríguez's LTD Benefits

From 2007 to 2012, Triple-S notified Rodríguez on various occasions that it was evaluating her claim for LTD benefits for physical disability, as the plan's 24-month fixed term for mental illness had expired. During this time period, Triple-S continued issuing the same monthly disability payments Rodríguez had been receiving for mental disability. In 2009, she was also requested to submit evidence of her SSA claim. On December 16, 2009, the SSA found Rodríguez to be disabled, retroactive to March 12, 2004. Since SSA benefits were to be deducted from the amount payable for disability under the plan, Triple-S requested a refund of all excess LTD benefits. Def. St. ¶ 13; Def. Opp. ¶¶ 49–50; App. 235–40, 260–62, 268–83, 298, 321–28, 331, 335–39, 342, 345–67, 384–94, 405, 539–41, 546–50, 560–72; App. Supp. 167, 182, 267–69.

Among the updated copies of treating physicians' progress notes and other paperwork sent for review was Dr. Concepción's assessment that Rodríguez was unable to perform a gainful job, and Dr. Dilia Díaz-García's, endocrinologist, report that Rodríguez's disability was permanent and total. Pl. St. ¶¶ 12–16; App. 242–44.

On February 14, 2008, a radiology exam revealed straightening of the cervical lordosis and spondylosis. App. 502. On February 18, a whole body bone scan revealed findings in her joints that were compatible with arthritic changes, but no evidence of active inflammatory process in the lumbar vertebrae, pelvis or hips ( App. 503), and a dual-energy densitometry revealed a normal lumbar spine, and left hip and left forearm bone density without evidence of osteoporosis or osteopenia. App. 519, App. Supp. 245.

---

[6] A letter dated January 3, 2007 informed Rodríguez that benefits expired September 16, 2006. App. 238, App. Supp. 167.

Dr. Cases filled out another Triple-S Functional Capacity Estimate form on February 9, 2009, which stated that Rodríguez could sit, stand, and walk for up to two hours each in an 8-hour work day, with periods of rest, for a total of 6 hours. She could occasionally lift and carry up to ten pounds and reach over her shoulders. She could not bend at the waist, squat, crawl, or climb stairs. She could use both hands in repetitive movements for simple gripping and fine manipulation, but not to pull or push. She could not use either foot for repetitive movements such as operations requiring foot controls. She had no visual limitations or travel restrictions. Dr. Cases assessed that Rodríguez was not able to work full-time or part-time. App. 290–91, 304–05; App. Supp. 166. He certified on December 14 that Rodríguez was completely disabled. Pl. St. ¶ 19; App. 263, 536.

Dr. Cases submitted another Functional Capacity Estimate on January 18, 2013. Pl. St. ¶ 8; App. 382–83, 531; App. Supp. 258, 260. According to Dr. Cases, Rodríguez could sit and stand for two hours with periods of rest during an 8-hour workday; walk no more than one hour with periods of rest; alternate between walking, sitting, and standing for one hour with periods of rest; occasionally lift and carry up to 20 pounds; occasionally climb stairs, crawl,[7] reach above shoulder level, and use her hands for simple gripping and fine manipulation. His assessment was thus that she could be active for no more than 6 hours a day with rest periods. She could not push or pull using a repetitive movement, bend her waist, or use her feet to complete repetitive movements. She had no restrictions performing activities in unprotected heights or with exposure to dust, smoke, and gases. She had slight restrictions for working in environments with abrupt changes in temperature and humidity and that required driving a vehicle. She had total restrictions in working around machinery in movement.[8] He opined that she could not work full-time. Pl. St. ¶¶ 8, 20–25; Def. Opp. ¶¶ 8, 20, 25; App. 382–83, 531; App. Supp. 166–67. On January 28, Dr. Cases added that Rodríguez had reached the maximum medical improvement, and that she was not fit to return

---

[7] Dr. Cases check-marked that she could both never and occasionally crawl.
[8] The check-marks in the translation for the portion of activity restrictions are not the same as in the original. App. 382.

to work, in spite of any work accommodations available for her limitations and restrictions. Pl. St. ¶ 10; App. 381, 534; App. Supp. 261.

Rodríguez filled out and submitted various Triple-S resource questionnaires, the last one being January 23, 2013, in which she claimed being unable to work because her conditions were permanent. She felt pain throughout her body that came and went, and there were days when she could not move. Sometimes she couldn't walk because of her neuropathy, but other times she could walk for 10-15 minutes. She needed help getting dressed because her shoulders/back/ankles hurt. She could drive about a mile from her house, and go shopping and to medical appointments. She could also cook, clean (sweep), do laundry (but not bend to remove items from the washer), and water her plants. She has quite a bit of difficulty sleeping. She did not anticipate working in the near future, either in her previous occupation or in any other occupation, due to her conditions, and was not interested in getting training or in working in another type of occupation or work activity. App. 294–97, 308–11, 373–76; App. Supp. 166–67.

Triple-S referred the case to Dr. Alfonso Bello ("Dr. Bello"), a rheumatologist, for an Independent Medical Review of Rodríguez's medical file, which he completed on April 13, 2013 without personally examining Rodríguez. The medical file contained evidence that dates from March 24, 2004 to March 8, 2013, although a phone conversation in 2013 was the only evidence from post-2006 regarding Rodríguez's physical condition that was deemed legible. Dr. Bello noted that the clinical data contained in the physician's progress notes did not demonstrate objective evidence of an active rheumatologic disorder with movement limitations or other findings that were not subjective pain.[9] Dr. Bello concluded that, from a rheumatologic perspective, Rodríguez's medical record did not support a finding that she suffered from an active and disabling

---

[9] Dr. Bello stated in his report that he was unable to contact Dr. Cases for a peer-to-peer discussion of Rodríguez's conditions and their impact on her functioning. Dr. Bello claims he left several phone messages to Dr. Cases. Dr. Cases denies having received messages by Dr. Bello. App. 395, 404, 408–10, 551–52; App. Supp. 204–05, 278.

disorder, and, hence, she was not permanently disabled. In sum, Dr. Bello believed that the medical record did not support a finding that she was permanently disabled since he found no reasonable physical limitations or restrictions supported by objective evidence. Pl. St. ¶¶ 33–40; Def. St. ¶¶ 14–15, 26; Def. Opp. ¶¶ 33, 36, 37; App. 395–400, 402, 404, 551–52; App. Supp. 298–303.

Triple-S also referred the case to a vocational specialist for an employability evaluation from a physical standpoint. The vocational specialist found, based on Dr. Bello's report, on May 6, 2013 that there were 162 sedentary and light duty occupations, including her previous job, available in the San Juan, Caguas, and Guaynabo metropolitan area, that Rodríguez could perform given her education, training, and previous work experience, and that met or exceeded her reasonable wage of $12.62 per hour. Some of these jobs are similar to the work she performed in her previous job at Mova, including technical and supervisory duties in laboratories. Pl. St. ¶¶ 41–43; Def. St. ¶¶18, 32; Docket No. 47–11, App. 405; App. Supp. 168, 182, 285, 294–97.

### Triple-S's Denial of LTD Benefits

On July 23, 2013, Triple-S denied Rodríguez's application for LTD benefits, finding she no longer met the plan's definition of disability. It found that her administrative record did not contain enough clinical evidence to support a finding that she was unable to physically perform the tasks of her previous job or any other occupation. Triple-S also terminated her mental illness disability benefits, as the benefits had been paid beyond the 24-month limit allowed by the plan, and did not request reimbursement for the excess benefits paid. Pl. St. ¶¶ 1–2, 4–6, 18, 32; Def. St. ¶ 19; App. 401–407.

On August 23, 2013, Rodríguez appealed Triple-S's decision and submitted new evidence, copies of her medical files,[10] and SSA documents. Def. St. ¶¶ 23–24; App. 411–557, App. Supp. 276–277. Dr. Concepción ordered further tests. A radiology exam performed on September 10 revealed straightening of the lumbar lordosis and spondyloarthritic changes and degenerative disc

---

[10] A copy of Dr. Cases's progress notes, starting from July 21, 2004, was filed on August 26, 2013. The hand-written notes are illegible. App. 411–500, App. Supp. 215–35.

disease at L5-S1 (App. 553), and a lumber MRI performed on September 16[11] showed slight lumbar degenerative disc disease, a straight column that suggests spasm of the paravertebral muscles, and deterioration of the lesion at the L5/S1 level when compared to the same study conducted in 2004. App. 554.

Triple-S referred the case to Dr. Inocencio A. Cuesta[12] ("Dr. Cuesta"), an internist with a sub-specialty in adult rheumatology, who performed an independent peer review on October 11, 2013 of Rodríguez's medical files but did not personally examine Rodríguez.[13] Dr. Cuesta concluded that, although the record sustained subjective evidence of pain, and a bone scan showed evidence of osteoarthritis, there was no objective evidence of joint inflammation or decreased range of motion in her joints. An MRI showed L5/S1 herniation and fragment post left intervertebral foramina, but he found no information that indicated this finding impaired Rodríguez. He noted that her musculoskeletal complaints worsened when her depression worsened, and that the record contained no clinical information as to how her physical ailments affected her ability to return to work. Dr. Cuesta concluded that Rodríguez did not suffer from a physical deterioration based on a rheumatoid condition that would prevent her from working full-time in a light or sedentary occupation. Dr. Cuesta unsuccessfully tried to contact Dr. Cases for a peer-to-peer discussion of the medical record and his findings. Def. St. ¶¶ 25, 30; App. Supp. 181–82, 194–96.

On December 3, 2013, Triple-S notified Rodríguez that it was denying benefits because the medical record did not support a finding that she suffered from a physical condition that prevented her from performing light or sedentary occupations, and that disability benefits under the mental illness provision of the LTD plan had already been exhausted, even if she continued to

---

[11] The translation erroneously dates the study April 5, 2004. App. 554, App. Supp. 207.

[12] Triple-S's notice of denial and other administrative documents and e-mails sometimes refer to the referral doctor as Dr. Inocencio Cuevas, but the correct name appears in an addendum prepared and signed by the referral doctor. App. Supp. 194–96, 201.

[13] Inexplicably, Triple-S did not provide Dr. Cuesta with Dr. Cases's 2013 Functional Capacity Estimate nor with the Resource Questionnaires that Rodríguez completed over the years, including in 2013. Pl. Opp. ¶¶ 28–30; App. Supp. 504–13.

be disabled due to a mental health condition. She was also advised of her right to sue under § 502(a) of ERISA since she had already exhausted the administrative remedies. Def. St. ¶¶ 38–41; App. Supp. 178–83.

Having exhausted administrative remedies, Rodríguez filed this suit, which was removed from state court.

## DISCUSSION

"Where, as here, a challenged denial of benefits is subject to de novo review under ERISA because there has been no grant of discretionary authority, 'our task on appeal is to independently weigh the facts and opinions in the administrative record to determine whether the claimant has met [her] burden of showing that [she] is disabled within the meaning of the policy.'" *Gross*, 734 F.3d at 17 (quoting *Scibelli v. Prudential Ins. Co. of Am.,* 666 F.3d 32, 40 (1st Cir. 2012)). As an independent arbitrator, the court is to "give no deference to the administrator's opinions or conclusions." *Id.* "One guiding principle in conducting de novo review of this ultimate conclusion is that it is the plaintiff who bears the burden of proving he is disabled." *Morales-Cintron v. Great Am. Life Ins. Co. of Puerto Rico*, No. CV. 07–1595 (CCC), 2009 WL 798727, at *2 (D.P.R. Mar. 20, 2009) (citing *Orndorf v. Paul Revere Life Ins. Co.*, 404 F.3d 510, 517–519 (1st Cir. 2005)).

In order to be covered for LTD benefits under the plan, Rodríguez had to comply with the plan's definition of "total disability" and be under a doctor's care during the entire time of the total disability.[14] According to the plan,

> "Total Disability" or Totally Disabled" [sic] means during the Elimination Period . . . that you are unable to perform all of the material and substantial duties of your occupation on a full-time basis because of a disability: (1) caused by injury or sickness; and (2) that started while you are insured.
>
> You will be totally disabled after the . . . [Elimination Period] if you are unable to perform with reasonable continuity all of the material and substantial duties of your

---

[14] The administrative file reflects that Rodríguez was receiving medical treatment for her physical conditions during the time period that Triple-S was determining her eligibility for continued LTD benefits under the plan, and before. App. 373, 402.

own or any other occupation for which you are or become reasonably fitted by training, education, experience, age and physical and mental capacity."

App. 10. The plan also included a separate limitation for mental health benefits: "The payment period for benefits may be limited if you are disabled due to mental illness. Benefits will not be paid for longer than twenty-four months."[15] App. 13.

Rodríguez already received LTD benefits for twenty-four months based on her disability caused by mental disorders, and Triple-S correctly stopped granting benefits based on that disability once the twenty-four months were up. Def. St. ¶¶ 12–13. Therefore, the question now is 1) whether she has a disability caused by injury or sickness that is not due to mental illness, and 2) whether that disability prevents her from performing her job or any other occupation for which she is reasonably fit. *See* Docket No. 84 at 5 (Triple-S framed the question as whether Rodríguez has shown that she has an "inability to perform, on a full-time basis, all of the material and substantial duties of her occupation, or any other occupation for which she is reasonably fit to do by training, education, experience, age, and physical and mental capacity" and whether her "inability to perform [is] caused by a disability, resulting from injury or sickness that started while she was insured").

Rodríguez's job as a quality supervisor for Mova required her to stand 30% of the time in an average 8-hour work day, sit 30% of the time, and walk 30% of the time. The job could be performed by alternating sitting and standing. She had to bend continuously and reach occasionally, but she rarely had to squat, climb, or kneel. She was not required to operate foot controls. She also had to lift 5% of the time, carry 5% of the time, and have at least a low degree of dexterity. She was required to lift about one pound on an infrequent basis. She had to frequently read and write, and the only required repetitive task was signing her name. App. 60, 83, 85, 376, 402.

Rodríguez relies heavily on Dr. Cases's opinion in claiming that she is unable to work. Pl. Mot. ¶¶ 30–36. Dr. Cases has been Rodríguez's doctor since 2004. Pl. St. ¶ 8. Dr. Cases, who

---

[15] There are two exceptions where payments will continue to be made after twenty-four months if the person is confined to a hospital or institution, but those are not relevant here.

opined that Rodríguez could not work full-time, in spite of any work accommodations that an employer could make available, rendered three Functional Capacity Estimates (2004, 2009, and 2013), all of which found that Rodríguez was totally disabled. Dr. Cases explained that, within an 8-hour workday, Rodríguez could sit and stand for two hours each with periods of rest. She could spend one hour alternating between walking, sitting, and standing. In 2004 and 2009 he found that she could walk for two hours with rest periods, and in 2013 he found that she could walk for only one hour with rest periods. Dr. Cases also assessed that Rodríguez could occasionally lift and carry up to 20 pounds, and climb stairs, which the job did not require, and occasionally reach above shoulder level, which the job did require. The job also required writing and signing her name, and Dr. Cases assessed that Rodríguez could use her hands for simple gripping and fine manipulation. She could not push or pull using a repetitive movement, or use her feet to complete repetitive movements, which the job did not require, and could not bend her waist, which the job required she perform continuously. In Dr. Cases's assessment, as of 2013, even with periods of rest, Rodríguez could work for no more than six hours a day, which rendered her unable to perform any full-time occupation. Pl. St. ¶¶ 8, 10, 20–25; Def. Opp. ¶¶ 8, 20, 25; App. 381–83, 531, 534; App. Supp. 166–67, 261.

Dr. Concepción, who treated her from 2005 to 2009, found limited shoulder range of motion on examination. App. 398. This assessment does not shed light as to how that impeded her from performing physical tasks such as lifting or reaching.

Rodríguez also offered multiple MRIs and radiology exams, including from 2013, to support her claim of disability based on degenerative joints and chronic back issues. A radiology exam performed on September 10, 2013 revealed straightening of the lumbar lordosis and spondyloarthritic changes and degenerative disc disease at L5-S1 (App. 553), and a lumber MRI

performed on September 16, 2013 showed slight lumbar degenerative disc disease, a straight column that suggests spasm of the paravertebral muscles, and deterioration of the lesion at the L5/S1 level when compared to the same study conducted in 2004. App. 554. As "the disabling symptom of fibromyalgia is typically pain" as opposed to an injury that is assessable through an MRI, Rodríguez understandably did not offer MRIs and radiology exams in support of her fibromyalgia disability. 10A Couch on Ins. § 147:36 (citing *Boxell v. Plan for Group Ins. of Verizon Communications, Inc.*, 51 F. Supp. 3d 759 (N.D. Ind. 2014)).

In her last resource questionnaire, dated February 5, 2013, Rodríguez reported being able to sometimes walk between fifteen to twenty minutes at a time and perform activities of daily living, such as cooking, sweeping and light mopping, washing clothes, watering plants, and light shopping. Some days she reported that she could not move at all and that her son has to help with her personal needs. She could also drive about a mile to get groceries and use her computer for a couple minutes. She reported having significant difficulty sleeping. App. 373–76.

Rodríguez has met her initial burden to show that she has a "disability caused by injury" and "is unable to perform with reasonable continuity all of the material and substantial duties of [her] own or any other occupation for which [she is] or become[s] reasonably fitted by training, education, experience, age and physical and mental capacity." App. 10. Through both objective and subjective evidence, she showed that her fibromyalgia and other physical conditions prevent her from working any job full-time because she cannot sit, stand, or walk, for more than a total of six hours a day. The medical record, which included functionality assessments, progress notes, and test results, was abundant and contained extensive evidence of physical conditions that were painful and limiting as per Rodríguez's own testimony via questionnaires and her treating

physicians' medical records.[16] Moreover, I place significant weight on the assessment of Dr. Cases because not only has he treated Rodríguez for over a decade, but also because diagnosing fibromyalgia depends on knowledge and long-term observation of subjective evidence such as the patient's pain. *See Cusson v. Liberty Life Assur. Co. of Boston*, 592 F.3d 215, 227 (1st Cir. 2010), *abrogated on other grounds by Montanile v. Bd. of Trustees of Nat. Elevator Indus. Health Benefit Plan*, 136 S. Ct. 651 (2016) (fibromyalgia is not diagnosed through objective evidence); *Jebian v. Hewlett-Packard Co. Employee Benefits Organization Income Protection Plan,* 349 F.3d 1098, 1109 n.8 (9th Cir. 2003) ("On *de novo* review, a district court, may, in conducting its independent evaluation of the evidence in the administrative record, take cognizance of the fact (if it is a fact in the particular case) that a given treating physician has a greater opportunity to know and observe the patient than a physician retained by the plan administrator."). Dr. Cases's consistent diagnosis of fibromyalgia since 2004 based on physical examinations and clinical testing and "consistent observations of physical manifestations of her condition" constitute "objective medical evidence" of Rodríguez's condition and her inability to perform the duties of an occupation. *Lee v. BellSouth Telecommunications, Inc.,* 318 Fed. App'x. 829, 837–38 (11th Cir. 2009).

To address whether Rodríguez's disability prevents her from performing an occupation, Triple-S presented evidence from its own reviewing doctors showing that Rodríguez does not have sufficient limitations on her functional capacity so as to merit a finding of total disability. Triple-S hired two doctors, Dr. Bello and Dr. Cuesta, to independently review Rodríguez's file and

---

[16] Rodríguez argues that Triple-S did not adequately consider her records, particularly Dr. Cases's 2013 evaluation. Although it is curious that Triple-S did not provide Dr. Cuesta with Dr. Cases's 2013 Functional Capacity Estimate (nor with Rodríguez's Resource Questionnaires where she documented her symptoms and functional capacity), it is clear that Triple-S, if not Dr. Cuesta, considered these documents. App. Supp. 504–13; *see Ortega-Candelaria*, 755 F.3d at 20 (*quoting Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)) ("Although a plan administrator 'may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician,' we do not require administrators to automatically grant 'special weight' to the opinion of a claimant's chosen provider.").

determine whether she was totally disabled. Neither doctor personally examined Rodríguez. *See Adams v. Metropolitan Life Ins. Co.,* 549 F. Supp. 2d 775 (M.D. La. 2007) (when a "case involves subjective accounts . . . the fact that only a file review was conducted is relevant")). In assessing her condition, the doctors could only require objective evidence that Rodríguez was unable to work and not of her diagnosis because fibromyalgia "does not lend itself to objective verification." *Cusson*, 592 F.3d at 227; *see also Morgan v. The Prudential Insu. Co. of Am.*, 755 F. Supp. 2d 639, 646 (E.D. Pa. 2010) ("Dr. Solomon's statement that Morgan's chronic pain is 'not documented by any objective findings' does not support a conclusion that he does not have a disabling condition. . . [because a] fibromyalgia disability claim can not be denied on the basis of a lack of objective findings." (citing *Steele v. Boeing Co.*, 225 Fed. App'x. 71, 74–75 (3d Cir. 2007))). The First Circuit "has emphasized before that in dealing with hard-to-diagnose, pain-related conditions, it is not reasonable to expect or require objective evidence supporting the beneficiary's claimed diagnosis." *Maher*, 665 F.3d at 304 (dissenting opinion) (citing *Cook v. Liberty Life Assurance Co.,* 320 F.3d 11, 21 (1st Cir. 2003)). Instead, the appropriate focus is whether the plaintiff has presented sufficient evidence of an inability to work based on "the physical limitations imposed by the symptoms of such illnesses." *Boardman v. Prudential Ins. Co. of Am.,* 337 F.3d 9, 16 n.5 (1st Cir. 2003); *see* 10A Couch on Ins. § 147:36 ("Because the disabling symptom of fibromyalgia is typically pain, which is inherently subjective, whether fibromyalgia is disabling under a long-term disability (LTD) governed by ERISA can be determined only by measuring the extent of a patient's physical limitations, not by a diagnostic or laboratory test." (citing *Boxell v. Plan for Group Ins. of Verizon Communications, Inc.*, 51 F. Supp. 3d 759 (N.D. Ind. 2014))).

The first doctor to review Rodríguez's file, Dr. Bello, found that "[t]he records do not support that the claimant should be placed on permanent disability. Clinical data from physician

notes failed to demonstrate active rheumatologic disorder with limitations of motion, strength, or other objective findings other than subjective pain." App. Supp. 400. This conclusion does not, as Triple-S contends, represent a finding that although Rodríguez is disabled with fibromyalgia, there is no objective evidence to suggest that she could not perform the tasks of her previous job. Docket No. 58 at 12 ("[B]oth Dr. Bello and Dr. Cuevas [sic] acknowledged that Plaintiff suffers from fibromyalgia and other conditions, but concluded such conditions were not accompanied by objective and disabling medical conditions that prevented Plaintiff from working."). Instead, Dr. Bello did not recognize the validity of any of the subjective evidence that could sustain a finding that Rodríguez's fibromyalgia is disabling. Although plan administrators may require objective evidence of functional limitations, they may not require objective evidence of a diagnosis of fibromyalgia, as Dr. Bello did when he stated that the "data" failed to demonstrate an active rheumatologic disorder." *Id*.

The fact that Dr. Bello based his opinion on Rodríguez's medical records from 2004-2006 as well as a single telephone conversation from 2013 makes his opinion more problematic to this assessment. As Triple-S argues, "findings . . . which were made in 2006, say little about Plaintiff's disability under the terms of the policy in 2013." Therefore, the same argument that Triple-S uses to discount the applicability of Dr. Concepcion's and Dr. Diaz-Garcia's findings of total disability in 2006 must also apply to Dr. Bello's opinion.

It is unclear how much Triple-S relied on Dr. Bello's improper requirement for objective evidence. Although Triple-S argues that "Dr. Bello's report did not impact Triple-S Vida's decision to deny benefits," it also admitted that its "denial decision was also based on the documentary evaluation made by [its] physician Dr. Alfonso Bello;" included his findings in its

statement of material facts; and stated that it rendered its decision based on "the totality of Plaintiff's LTD claim record." Docket No. 58 at 7; Pl. St. ¶ 6; Def. Resp. 6; Def. St. ¶¶ 15–17, 38.

Triple-S's Employability Evaluation is also unpersuasive for the same reason. The Vocational Specialist who conducted the Employability Evaluation relied on Dr. Bello's medical review, which I have found to be problematic for the reasons above. *See* Def. St. ¶ 33 ("The Evaluator took into account Dr. Bello's medical review of Plaintiff's file."). As the Employability Evaluation was based on Dr. Bello's assessment, I find that Triple-S erred in relying on it to make its assessment of Rodríguez's disability. Without the Employability Evaluation, the only assessment of what activities Rodríguez can perform are Dr. Cases's Functional Capacity Estimates from 2004, 2009, and 2013, all of which stated that she cannot perform any part-time or full-time job. As such, there is no longer any evidence that Triple-S can point to in support of its conclusion that Rodríguez can perform occupations even with her disability. *See Urso v. Prudential Ins. Co. of Am.*, 532 F. Supp. 2d 292, 307 (D.N.H. 2008) (plaintiff showed "he is disabled within the meaning of the plan" when plaintiff's limited driving ability prevented "him from performing the occupations defendant identified in the Manchester labor market").

Consequently, upon a de novo review of the administrative record, I find that one of Triple-S's two independent medical evaluations deserves no weight because Dr. Bello inappropriately did not merit Rodríguez's subjective evidence and based his analysis on dated information, and that Triple-S's Employability Evaluation relied on Dr. Bello's discounted medical evaluation.

Rodríguez also claims that the fact that the SSA awarded her benefits corroborates her inability to work. App. 331–34, 367–69. Triple-S argues that it did not consider the SSA's determination in determining total disability, and only requested this information in determining

the amount of benefits payable during total disability because SSA benefits are deducted from the amount payable under the plan. Def. Opp. ¶¶ 49–50.

Triple-S's notice of denial of benefits correctly informed Rodríguez that its decision was not tied to the SSA's decision, as its determination was based on the medical evidence available to them along with the provisions of the LTD policy, and not on the SSA's criteria to determine eligibility. App. Supp. 181. Although a SSA determination may provide relevant evidence, a plan is not required to accept a SSA adjudication of disability as binding where the definitions of disability differ. *Scibelli v. Prudential Ins. Co. of Am.*, 666 F.3d 32, 42 (1st Cir. 2012). "The calculus of decision in social security cases differs significantly from that employed in ERISA cases." *Leahy*, 315 F.3d at 20. Where the SSA has a specific framework for determining disability, no comparable or specially promulgated set of criteria exists in ERISA cases. *Id.* "The fiduciary's decision is constrained only by the language of the particular plan at issue and by a judge-made adjudicative standard." *Id.* "Consequently, although a related Social Security benefits decision might be relevant to an insurer's eligibility determination, it should not be given controlling weight except perhaps in the rare case in which the statutory criteria are identical to the criteria set forth in the insurance plan." *Pari-Fasano v. ITT Hartford Life & Accident Ins. Co.*, 230 F.3d 415, 420 (1st Cir. 2000).

The SSA made a favorable decision in Rodríguez's case, finding that both her back and affective disorders were so severe that they met the requirements of one of the impairments found in their Listing of Impairments. App. Supp. 267. Triple-S was not considering her affective disorder when assessing if she was "disabled," as per plan policy. It is evident that the criteria used to determine disability are not the same, and a finding of disability based on a combination of physical and mental impairments may not be relevant to Triple-S's determination of LTD eligibility for physical impairment alone. *See Bard v. Bos. Shipping Ass'n*, 471 F.3d 229, 242 n.17 (1st Cir. 2006) (insurer would have appropriately addressed Social Security determination if it explained to plaintiff that they discounted it "because of a differing definition of disability, or a

differing level of deference to treating physicians"); App. Supp. 182 ("We do not evaluate according to the criteria established by the SSA in determining eligibility for LTD benefits.").

Finally, Rodríguez argues that Triple-S had a conflict of interest in administering her case because it both made the eligibility determinations for benefits and also was responsible for paying those benefits. *See* Docket No. 85 at 15. While an administrator's conflict of interest is undoubtedly an important factor to consider, "it is well-established that in ERISA denial-of-benefits cases, the plaintiff has the burden of showing that a conflict of interest influenced the decision of the plan administrator." *Lauziere v. Aetna Life Ins. Co.*, No. CV 13-10989-FDS, 2014 WL 12599818, at *9 (D. Mass. Oct. 21, 2014) (citing *Cusson*, 592 F.3d at 225). Here, Rodríguez has provided no evidence that Triple-S was influenced by this conflict of interest. In fact, Rodríguez states nothing about the conflict other than the fact that it exists. *See* Docket No. 85 at 15 ("Hence, Defendant operated the plan under a clear conflict of interests, and that also denotes a bias, arbitrarily and capriciously took the decision to discontinue with the granted benefits."). With no information on whether Triple-S took "active steps to reduce potential bias" or whether it took any actions that demonstrated its interest in not paying Rodríguez benefits, I cannot "accord any special weight to the conflict" in my analysis to the fact that Triple-S is both an administrator and funder of benefits. *Prince v. Metro. Life Ins. Co.*, No. CV. 08-471-JL, 2010 WL 988730, at *2 (D.N.H. Mar. 16, 2010).

Having concluded that both Triple-S's Employability Evaluation and one of its reviewing doctors' evaluation are flawed, I am left to weigh the remaining evidence including the opinion of Dr. Cases, who found that Rodríguez was disabled and could not perform an occupation, and the opinion of Dr. Cuesta, who found that Rodríguez had no functional limits that would prevent her from working. As explained above, I place greater weight on the opinion of Dr. Cases given the fact that he conducted a multi-year and in-person assessment of Rodríguez's conditions, which are inherently difficult to diagnose and assess. Based on Dr. Cases's opinion that Rodríguez's

disability makes her unable to perform the material and substantial duties of any occupation and the complete medical record, it is clear that Rodríguez is totally disabled per the plan's definitions. App. 10.

Therefore, the question becomes whether the appropriate remedy is to remand the case to Triple-S for further evaluation in line with this opinion or to award benefits to Rodríguez. "The First Circuit has adopted a 'flexible approach' which allows courts 'considerable discretion' to craft a remedy after finding a mistake in the denial of benefits." *Tracia v. Liberty Life Assurance Co. of Boston*, 164 F. Supp. 3d 201, 226 (D. Mass. 2016) (quoting *Buffonge v. Prudential Ins. Co. of Am.*, 426 F.3d 20, 31 (1st Cir. 2006)). This discretion includes "the power to remand to the claims administrator" and "the power, in appropriate cases, to award benefits to the disability claimant." *Buffonge*, 426 F.3d at 31. Rodríguez seeks an award of benefits. Docket No. 85 at 15–16.

In this case, as the evidence shows that Rodríguez "was denied benefits to which [s]he was clearly entitled," I find that it is appropriate to award Rodríguez benefits rather than to unnecessarily prolong the process by returning the case to Triple-S. *Buffonge*, 426 F.3d at 31; *see Cook*, 320 F.3d at 24 ("[R]etroactive reinstatement of benefits is appropriate in ERISA cases where, as here, but for [the insurer's] arbitrary and capricious conduct, [the insured] would have continued to receive the benefits." (quoting *Grosz–Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1163 (9th Cir. 2001) (internal quotations omitted))); *see also Zervos v. Verizon New York Inc.*, 277 F.3d 635, 648 (2d Cir. 2002) ("[A] remand of an ERISA action seeking benefits is inappropriate where the difficulty is not that the administrative record was incomplete but that a denial of benefits based on the record was unreasonable."); *cf. Tracia*, 164 F. Supp. 3d at 227 ("[W]here the court 'cannot say with assurance that [the claims administrator] denied [the

claimant] benefits to which [he] was entitled,' but still has doubts about the justification for the claims administrator's decision, a remand is the appropriate remedy." (quoting *Gross*, 734 F.3d at 27)).

## CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment is **DENIED** and the plaintiff's motion for summary judgment on the grounds that she is entitled to disability benefits is **GRANTED**. On or before February 14, 2018, Triple-S shall submit to the court its calculation of the benefits, past and future, owed to Rodríguez under this decision, taking into consideration any offset required by the plan. Rodríguez will then have fourteen days to respond. The court notes that Rodríguez has requested attorney's fees and costs under 29 U.S.C. § 1132(g). That request is denied without prejudice; Rodríguez may request attorney's fees in a separate motion once judgment is entered.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 30th day of January, 2018.

*S/Bruce J. McGiverin*
BRUCE J. McGIVERIN
United States Magistrate Judge